## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## FORT WORTH DIVISION

| | | |
|---|---|---|
| **STEVEN WAYNE COOPER,** | § | |
| **Petitioner,** | § | |
| | § | |
| **v.** | § | **Civil Action No. 4:13-CV-082-Y** |
| | § | |
| **WILLIAM STEPHENS, Director,**[1] | § | |
| **Texas Department of Criminal Justice,** | § | |
| **Correctional Institutions Division** | § | |
| **Respondent.** | § | |

## FINDINGS, CONCLUSIONS, AND RECOMMENDATION
## OF THE UNITED STATES MAGISTRATE JUDGE
## AND NOTICE AND ORDER

This cause of action was referred to the United States Magistrate Judge pursuant to the

provisions of 28 U.S.C. § 636(b), as implemented by an order of the United States District Court for

the Northern District of Texas.  The Findings, Conclusions, and Recommendation of the United

States Magistrate Judge are as follows:

## I. FINDINGS AND CONCLUSIONS

### A. NATURE OF THE CASE

This is a petition for writ of habeas corpus by a state prisoner under 28 U.S.C. § 2254.

### B. PARTIES

Petitioner Steven Wayne Cooper, TDCJ #1495275, is a state prisoner in custody of the Texas

Department of Criminal Justice, Correctional Institutions Division, in Tennessee Colony, Texas.

---

[1]Effective June 1, 2013, William Stephens succeeded Rick Thaler as the Director of the
Correctional Institutions Division of the Texas Department of Criminal Justice.  Pursuant to Rule
25 of the Federal Rules of Civil Procedure, Director Stephens is "automatically substituted as a
party." FED. R. CIV. P. 25(d)

Respondent William Stephens is the Director of the Texas Department of Criminal Justice, Correctional Institutions Division.

### C. FACTUAL AND PROCEDURAL HISTORY

The state appellate court set forth the factual and procedural history of the case as follows:

On June 14, 2007, Evelyn Cooper went to the Hood County Sheriff's Office to report threats Cooper had made to her the night before. Hood County Captain Clint Pullin took her report and advised her to seek a protective order. Cooper was waiting for Evelyn when she came home.

The next day, Nancy and Ronald Lock encountered Evelyn and Cooper at a convenience store. Evelyn was bloody and severely beaten up, she was crying blood, and "[h]er whole face was black and blue." Ronald did not recognize her at first, although he had known Evelyn most of his life. Photographs of Evelyn's injuries were admitted and published to the jury. She suffered fractures of her facial bones and both of her eyes were blackened.

Evelyn told Nancy that Cooper was inside the house when she came home and that he told her she was going to die and that he knew from watching forensic television shows how to get away with it. Ronald said that Evelyn told them that Cooper tied her to a chair, beat on her with a pipe, hit her in the face and ribs, and only untied her because he had run out of beer and needed to go to the convenience store.

Evelyn stated that she could not swear that Cooper hit her with a pipe, but he did hit her in the face with his fist and tie her up with electrical wire and duct tape, and he told her that she was going to be with her mother, who had passed away two years before. She testified that Cooper had a drinking problem and would sometimes become abusive, although he never hit her until June 2007.[FN1] Evelyn also testified that Cooper had some mental problems–he was bipolar and schizophrenic–and that, when he drank, the mental problems worsened.

[FN1]Evelyn's sister testified that there had been numerous incidents of violence between Evelyn and Cooper before June 2007.

Ronald fought Cooper to keep him away from Evelyn. After Ronald "took him down to the ground," Cooper got up, got into his car, and took off. Lieutenant Bill Haynes testified that authorities found Cooper's abandoned vehicle and had to track Cooper with a police dog. Cooper fought the deputies as they tried to take him

2

into custody.  The deputies found a rifle in the back seat of Cooper's vehicle during an inventory search.

In September 2007, a grand jury returned an indictment on Cooper for the following alleged acts, occurring on or about June 15, 2007:

• Count 1:  Intentionally or knowingly causing bodily injury to Evelyn Cooper by striking her in her stomach and left breast area while using or exhibiting a deadly weapon (metal pipe);
• Count 2:  Intentionally or knowingly causing serious bodily injury to Evelyn Cooper by repeatedly striking her in the face and head with his fists.
• Count 3:  Intentionally or knowingly possessing a firearm after he had been convicted of felony DWI on April 1, 2004;
• Count 4:  Intentionally fleeing, using a vehicle, from James Cromwell, a peace officer who was attempting to lawfully arrest or detain him.

The indictment also included one enhancement paragraph (an August 10, 2004 felony DWI conviction) and three habitual offender counts:  a February 10, 1995 felony criminal mischief conviction; a May 7, 1991 felony aggravated assault with a deadly weapon conviction; and a May 24, 1991 felony bodily injury to a child conviction.

In October 2007, the trial court found Cooper incompetent and sent him to a state hospital to regain competency for trial.  Once returned to the trial court, Cooper pleaded guilty to counts 1 and 2, and the jury assessed sixty years' confinement for count 1, after finding that a deadly weapon had been used, and twenty-five years' confinement for count 2.  The trial court set the sentences to run concurrently.

(SHR at 121-23[2])

## D. ISSUES

The following grounds for relief are raised by this petition: (1) trial counsels were ineffective by failing to investigate his complete mental health history and mental health records; (2) trial counsel was ineffective at the punishment phase for failing to present mitigating evidence of mental illness; and (3) he was not competent to stand trial.  (Pet. at 6-7 & Attach.)

---

[2]"SHR" refers to the record of petitioner's state application No. WR-62,173-02.

### E. RULE 5 STATEMENT

Respondent believes petitioner has exhausted his state remedies on the claims presented as required by 28 U.S.C. § 2254(b)(1)(a). (Resp't Ans. at 5)  Respondent also believes the petition is neither subject to the successive-petition bar nor barred by limitations. *Id.* § 2244(b), (d).

### F. DISCUSSION

*Legal Standard and for Granting Habeas Corpus Relief*

Under 28 U.S.C. § 2254(d), a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a state court shall not be granted with respect to any claim that was adjudicated on the merits in state court proceedings unless he shows that the prior adjudication: (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court. 28 U.S.C. § 2254(d). A decision is contrary to clearly established federal law if the state court arrives at a conclusion opposite to that reached by the Supreme Court of the United States on a question of law or if the state court decides a case differently than the Supreme Court has on a set of materially indistinguishable facts. *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000); *see also Hill v. Johnson*, 210 F.3d 481, 485 (5th Cir. 2000). A state court decision will be an unreasonable application of clearly established federal law if it correctly identifies the applicable rule but applies it unreasonably to the facts of the case. *Williams*, 529 U.S. at 407-08.

The statute further requires that federal courts give great deference to a state court's factual findings. *Hill*, 210 F.3d at 485. Section 2254(e)(1) provides that a determination of a factual issue made by a state court shall be presumed to be correct. The applicant has the burden of rebutting the

4

presumption of correctness by clear and convincing evidence. 28 U.S.C. § 2254(e)(1). Typically,

when the Texas Court of Criminal Appeals denies relief in a state habeas corpus application without

written order, as here, it is an adjudication on the merits, which is entitled to this presumption.

*Singleton v. Johnson*, 178 F.3d 381, 384 (5th Cir. 1999); *Ex parte Torres*, 943 S.W.2d 469, 472 (Tex.

Crim. App. 1997).

*The State Courts' Adjudication of Petitioner's Claims*

On direct appeal, the state appellate court, relying on Supreme Court precedent as well as

state statutory and case law, thoroughly addressed petitioner's claims in affirming the trial court's

judgment. (SHR at 120-38) To assist the court and the reader, the majority opinion, in large part,

is set forth below:

**III. Mental Competence**

In his first two issues, Cooper argues that the trial court erred by accepting his guilty plea and by trying him without first determining that he was competent to stand trial.

**A. Due Process**

Under the Due Process Clause of the Fourteenth Amendment, a trial court may not accept a criminal defendant's guilty plea unless that defendant is legally competent to make such a plea. *See Godinez v. Moran,* 509 U.S. 389, 400 (1993). And once a defendant has been adjudged incompetent, "on the return of a defendant to the court, the court shall make a determination with regard to the defendant's competency to stand trial." Tex. Code Crim. Proc. Ann. art. 46B.084(a) (Vernon Supp. 2010); *see also Bradford v. State,* 172 S.W.3d 1, 4-6 (Tex. App.–Fort Worth 2005, order) (abating appeal and remanding case to the trial court to make a judicial determination regarding appellant's competency at the time of the adjudication hearing), *disp. on merits,* No. 02-04-00414-CR, 2005 WL 1926409 (Tex. App.–Fort Worth Aug. 11, 2005, no pet.) (mem. op., not designated for publication). *See generally Thomas v. State,* No. AP-75218, 2008 WL 4531976, at *13-14 (Tex. Crim. App. Oct. 8, 2008) (not designated for publication) (noting that while a better practice is for the trial court to make the competency determination prior to trial, a retrospective one will suffice).

5

The record must contain a judgment, order, docket entry, or other evidence that the trial court actually made a determination of competency. *Schaffer v. State,* 583 S.W.2d 627, 631 (Tex. Crim. App. 1979) (op. on reh'g); *see also Johnson v. State,* Nos. 02-05-00205-CR, 02-05-00206-CR, 2006 WL 2578033, at *5 (Tex. App.–Fort Worth June 22, 2006, order) (not designated for publication) ("Letters from a psychiatrist or psychiatric evaluations containing recitations of competency are evidentiary only; they cannot operate as a substitute for a judicial fact finding of a defendant's competency to stand trial."), *disp. on merits,* 2006 WL 2310085 (Tex. App.–Fort Worth Dec. 6, 2006, pet. ref'd) (mem. op., not designated for publication). *Compare Fuller v. State,* 11 S.W.3d 393, 395 (Tex. App.-Texarkana 2000, order) (abating for judicial determination of competency when record contained no judgment, order, docket sheet entry, or other evidence that the trial court ever made a determination of appellant's competency to stand trial), *disp. on merits,* 30 S.W.3d 441 (Tex. App.–Texarkana 2000, pet. ref'd), *with Bell v. State,* 814 S.W.2d 229, 233 (Tex. App.–Houston [1st Dist.] 1991, pet. ref'd) (holding that recitations of competency in judgments of prior convictions for DWI were sufficient to allow State to use them to raise current DWI charge to a third-degree felony).

## B. Competence Determination by the Trial Court

1. Pretrial

In September 2007, a week after the grand jury filed Cooper's indictment, Cooper's original trial counsel, Pamela Walker, filed a motion suggesting incompetency and a request for examination. *See* Tex. Code Crim. Proc. Ann. art. 46B.004 (Vernon 2006). The trial court issued an order for William B. Norman, Ph.D. to conduct an examination regarding incompetency and, after considering Dr. Norman's report, issued a judgment finding Cooper incompetent and committing him to a mental hospital until he could attain competency to stand trial. *See id.* arts. 46B.005 (Vernon 2006), .073 (Vernon Supp. 2010).

In February 2008, Walker filed a motion to withdraw as counsel, stating that she was unable to effectively communicate with Cooper in order to provide him with adequate representation. As examples of this and other good cause for granting the motion, Walker listed: (1) Cooper's regular and continual attempts to fire her via written correspondence "due to a delusional belief that [she was] against him"; (2) Dr. Norman's competency evaluation report, reflecting that Cooper "has definite problems interacting with women"; (3) the psychiatric evaluation report by Dr. Dori Johnson, one of the North Texas State Hospital doctors, in which Cooper indicated that he had reservations about Walker's willingness and ability to handle his case effectively due to Walker being the same gender as his alleged victim; and (4) Cooper's violent and unpredictable acts while she represented him, to the extent that

6

her ability to represent him was compromised and caused her concern for her safety–on two occasions, he sent correspondence to her office that was covered in his blood.

Walker attached a copy of Dr. Norman's competency evaluation and a copy of Dr. Johnson's psychiatric report to her motion. No other copies of these reports were included in the record. *Cf.* Tex. Code Crim. Proc. Ann. art. 46B.079 (Vernon Supp. 2010).

Dr. Norman's October 3, 2007 competency evaluation indicated that Cooper was not competent to stand trial, that Cooper suffered from bipolar disorder with psychosis and alcohol abuse, and that Cooper manifested evidence of a thought disorder, delusional thinking, and hallucinations. At one point, Dr. Norman noted, "I would like to point out that I believe that some of this gentleman's reported symptomology is manipulative, but without a doubt, he does suffer with an illness of psychotic proportion."

Dr. Johnson's evaluation, conducted mid-January 2008, indicated that Cooper had regained competency to stand trial. She reported that while confined to the mental hospital, Cooper received psychiatric treatment in the form of psychotropic medications, psychosocial rehabilitation, and formal competency training. She also reported that Cooper appeared to be feigning or exaggerating some of his symptoms, providing specific examples:

• While Cooper consistently reported experiencing auditory and visual hallucinations, his accounts varied, and neither his treatment team nor unit staff ever observed him outwardly responding to internal stimuli.[FN2] Cooper's behavior throughout his stay on the competency unit was continuously exemplary and paradoxical with his behavior while meeting with his treatment team, as well as inconsistent with his reported symptoms of psychosis.

> [FN2]Doctor Johnson reported,
>
> > Overall, Mr. Cooper has been functioning in a way that is inconsistent with someone who is experiencing psychotic symptoms such as delusions and hallucinations. The only evidence that supports the idea that he is experiencing hallucinations is his own self-report, as the unit staff has never witnessed him exhibiting bizarre behavior or responding to internal stimuli.

• Cooper told one of the nurses that he purposely performed poorly on a written competency test, stating, "I could have done better, but I'm not sure if it's a good

idea." He told the nurse that he had heard from other patients that there was a way to stay at the hospital rather than doing jail time.

• There was no evidence of current memory, intellectual, or psychological impairment that would prevent Cooper from being able to assist in his defense if he chose to do so.

• Cooper demonstrated that he understood the four plea options: Guilty, not guilty, not guilty by reason of insanity, and no contest. He also demonstrated that he understood the concept of a plea bargain and that he would be the one to decide whether to accept one, as well as the rights that would be forfeited if he accepted a plea bargain.

• Dr. Johnson concluded that Cooper was a "less than perfect defendant," and would be difficult to work with because of his "attempts to avoid prosecution and be psychiatrically hospitalized."

Dr. Johnson recommended that Cooper's defense attorney "should encourage him to be as forthcoming as possible with an emphasis on how this approach is beneficial to him and the possible negative consequences of exaggerating or feigning impairment." She also added that Cooper "is not expected to regress in psychological functioning, but it is possible that he will continue his attempts to feign or exaggerate psychological deficits."

## 2. Guilty Plea and Punishment Trial

Cooper's two-day trial began April 7, 2008. The trial court had the opportunity to evaluate Cooper's competence before trial in light of both competency reports and Walker's allegations in her motion to withdraw and by observing him during the plea admonishments.

During the admonishments, the trial court asked Cooper if he wanted to enter a plea of guilty to the charges against him, and Cooper said yes. James Winegardner, who was appointed as counsel when the trial court allowed Walker to withdraw, added, "Yes, Your Honor. It says there count[] 1 and count 2. I believe that count 3 and 4 will be waived if we plead guilty to count[s] 1 and 2,"[FN3] and Cooper again said, "Yes." The trial court then explained count 1 of the indictment and asked Cooper if he understood. Cooper assented and stated that his plea was guilty. The trial court then explained count 2 of the indictment and asked Cooper if he understood. Again, Cooper assented and stated that his plea was guilty.

FN3The State filed a motion to dismiss counts 3 and 4 after Cooper's trial on counts 1 and 2, and the trial court entered an order to that effect.

Next, the trial court asked Cooper if he had gone over the enhancement and habitual paragraphs with Winegardner. When Cooper said yes, the trial court proceeded to explain each paragraph, asking after each paragraph if Cooper understood. Cooper said yes and pleaded true to each, although he added to habitual count 3 that he had pleaded guilty to the bodily-injury-to-a-child charge but that he was not actually guilty. The trial court then explained that if Cooper decided to enter a plea of guilty before the jury, he would instruct the jury to find Cooper guilty. Cooper said that he understood.

The trial court then asked Cooper if he was entering his guilty plea freely and voluntarily, and Cooper said yes. Cooper said no when the trial court asked him whether anybody had forced him, coerced him, or made any promises to him to get him to enter that plea. The trial court and Cooper then had the following conversation

THE COURT: All right. So are you entering a plea of guilty before the jury that's selected here because you are, in fact, guilty of that offense?

DEFENDANT: Yes, sir.

THE COURT: All right. And for no other reason?

DEFENDANT: No, sir.

THE COURT: All right. Now, I want to tell you this, too, that based upon your plea before me here to this enhancement paragraph and these habitual counts, that the punishment range for this offense now is for–is by confinement in the Institutional Division of Texas Department of Criminal Justice for any–for life or for any term of not less than 25 years nor more than 99 years. Now, do you understand that range of punishment for the offense?

DEFENDANT: No, sir. Could you explain that to me again?

THE COURT: Sure. The range of punishment for the offense to which you pled guilty here–

DEFENDANT: Yes, sir.

THE COURT: –okay, based upon the fact that you have pled true to habitual enhancement paragraph 1 and habitual counts 1, 2 and 3, the range of punishment that is available for the jury to assess here against you is for life in the penitentiary or for any term of not less than 25 years nor more than 99 years.  Okay?  Do you understand that?

DEFENDANT:  Yes, sir

THE COURT:  The minimum is 99, the maximum is–pardon me.  The minimum is 25 years and the maximum is 99 years or life.

DEFENDANT:  Okay.

THE COURT:  All right.  Do you understand that?

DEFENDANT:  Yes, sir.

THE COURT:  All right.  Now, knowing that that's the range of punishment for the offense, do you still want to plead guilty?

DEFENDANT:  Yes, sir.

THE COURT:  All right.  Then, again, are you pleading guilty because of fear or threats or persuasion?

DEFENDANT:  I want to plead, sir, yes, sir, I want to plead guilty.

THE COURT:  Well, what I said was this, and, that is, are you pleading guilty because of fear or threats or persuasion?

DEFENDANT:  No, sir.

THE COURT:  Has anybody forced you to do that?

DEFENDANT:  No, sir.

THE COURT:  All right. And you understand that you do have the right to plead not guilty?  Do you understand that fully?

DEFENDANT:  Yes, sir, yes, sir.

THE COURT:  You can plead not guilty.  Do you understand that?

DEFENDANT: Yes, sir. I–I–

THE COURT:  All Right.  You–understand that–that right that you have, as an accused person, to plead not guilty?  Do you understand all that?

DEFENDANT: Yes, sir.  I'm sorry.  I'm sorry, Judge.

THE COURT:  Okay.  But if you plead not guilty, then you understand that the State's lawyers would have to prove you guilty, they would have to bring in evidence here and present all the evidence to the jury?

DEFENDANT: Yes, sir. Yes, sir. I–I–I'm sorry.  I–I–I'm very sorry.

THE COURT:  All right.

DEFENDANT:  I'm very sorry I hurt my wife.  She's the only thing I had.  I–I love my wife, and I hope 12 people over there, I–if I–you can't tell me that I ain't, I loved her, and I'm so–so sorry that I hurt her.

THE COURT:  All right.  Well, do you understand–do you–

DEFENDANT:  I'm sorry, Judge.

THE COURT:  And now do you understand that this jury, if you–with your pleading guilty, is going to decide what your punishment is?  Do you understand that I'm going to instruct them to find you guilty and decide your punishment?  Do you understand that?

DEFENDANT:  Yes, sir.

THE COURT:  All right.  And that, again, is that what you want to have happen here?

DEFENDANT: Yes, sir.

THE COURT:  And you talked to your lawyers about all this, is that right?

DEFENDANT: Yes, sir.

THE COURT:  And that's–that's what you have decided to do freely and voluntarily, is that correct?

DEFENDANT:  Yes, sir.

THE COURT: All right. All right. Then I'll allow you to plead guilty before the jury and, of course, true to these enhancement and habitual counts.

After voir dire, Cooper made his pleas before the jury. Cooper called the prosecutor a liar as the prosecutor read the indictment, but he pleaded guilty to both counts without additional comment, and he pleaded true to the enhancement and habitual paragraphs.

At the end of the first day of trial, Winegardner informed the trial court that Cooper wanted the opportunity to go back to the state hospital for additional treatment. The trial court denied the request.

The trial court admonished Cooper several times not to talk during trial other than to whisper to his attorney. It also admonished Cooper about his right not to testify. At the conclusion of trial, the trial court explained to Cooper that he would have a right of appeal.

### 3. Jury Charge and Judgments

The punishment charge states that Cooper had been charged by indictment in counts one and two with the offense of aggravated assault and

> [t]o this charge, the defendant has entered his plea of guilty. He has persisted in entering his plea of guilty, notwithstanding that the Court, as required by law, has admonished him of the consequences of such plea. *It plainly appearing to the Court that the defendant is mentally competent, and that he makes this plea freely and voluntarily, his plea is by this Court received.* [Emphasis added.]

Both judgments contain the following language: "It appeared to the Court that Defendant was mentally competent and had pleaded as shown above to the charging instrument."

### C. Analysis

We cannot tell from the record the exact moment when the trial court determined that Cooper was competent to stand trial. However, both the punishment charge and the judgments reflect a finding by the trial court that Cooper was mentally competent to stand trial.[FN4]  And the record reflects that the trial court had the opportunity to consider Cooper's competence before trial, that it thoroughly admonished Cooper before trial, and that it had the opportunity to evaluate Cooper's mental competence both before and during trial. Therefore, we conclude that the trial court made a determination of Cooper's competency before accepting Cooper's

12

guilty pleas. *Schaffer,* 583 S.W.2d at 631; *cf.* Tex. Code Crim. Proc. Ann. art. 46B.004(b) ("If evidence suggesting the defendant may be incompetent to stand trial comes to the attention of the court, the court on its own motion shall suggest that the defendant may be incompetent to stand trial."); *Montoya v. State,* 291 S.W.3d 420, 426 (Tex. Crim. App. 2009) (stating that the standard of review for a competency determination is abuse of discretion because "those who observed the behavior of the defendant at the hearing were in a better position to determine whether [ ]he was presently competent"). Therefore, we overrule Cooper's first two issues.

> [FN4]This is in direct contrast to the situation this court examined in *Bradford,* in which we noted that the record contained "no judgment, order, docket sheet entry, or other statement or evidence showing that the trial court made a determination" that the appellant had regained competency. 172 S.W.3d at 5. Because nothing in the record supported a conclusion that the appellant had regained competency, we remanded that case to the trial court for a retrospective judicial determination of competency. *Id.* at 6.

### IV. Ineffective Assistance of Counsel

In his third issue, Cooper argues that he received ineffective assistance of counsel when his trial counsel failed to examine his file prior to trial and then advised and allowed him to plead guilty while he was incompetent. Specifically, Cooper complains that he "acted strictly under the guidance and advice of the trial counsel. He pleaded guilty without an agreed recommendation as to punishment; under the effect of psychoactive medication prescribed by the evaluating psychiatrist, and having previously been found incompetent, without a standing adjudication declaring him competent to stand trial." Cooper asserts that a perfunctory examination of his file would have revealed that there was a judgment of his incompetency and that he was on psychoactive medication.

### A. Standard of Review

To establish ineffective assistance of counsel, appellant must show by a preponderance of the evidence that his counsels representation fell below the standard of prevailing professional norms and that there is a reasonable probability that, but for counsels deficiency, the result of the trial would have been different. *Strickland v. Washington,* 466 U.S. 668, 687 (1984); *Salinas v. State,* 163 S.W.3d 734, 740 (Tex. Crim. App. 2005); *Mallett v. State,* 65 S.W.3d 59, 62-63 (Tex. Crim. App. 2001); *Thompson v. State,* 9 S.W.3d 808, 812 (Tex. Crim. App. 1999); *Hernandez v. State,* 988 S.W.2d 770, 770 (Tex. Crim. App. 1999).

13

In evaluating the effectiveness of counsel under the first prong, we look to the totality of the representation and the particular circumstances of each case. *Thompson,* 9 S.W.3d at 813. The issue is whether counsel[']s assistance was reasonable under all the circumstances and prevailing professional norms at the time of the alleged error. *See Strickland,* 466 U.S. at 688-89. Review of counsel[']s representation is highly deferential, and the reviewing court indulges a strong presumption that counsel[']s conduct fell within a wide range of reasonable representation. *Salinas,* 163 S.W.3d at 740; *Mallett,* 65 S.W.3d at 63. A reviewing court will rarely be in a position on direct appeal to fairly evaluate the merits of an ineffective assistance claim. *Thompson,* 9 S.W.3d at 813-14. In the majority of cases, the record on direct appeal is undeveloped and cannot adequately reflect the motives behind trial counsel[']s actions. *Salinas,* 163 S.W.3d at 740 (quoting *Mallett,* 65 S.W.3d at 63). To overcome the presumption of reasonable professional assistance, any allegation of ineffectiveness must be firmly founded in the record, and the record must affirmatively demonstrate the alleged ineffectiveness. *Id.* (quoting *Thompson,* 9 S.W.3d at 813). It is not appropriate for an appellate court to simply infer ineffective assistance based upon unclear portions of the record. *Mata v. State,* 226 S.W.3d 425, 432 (Tex. Crim. App. 2007).

An appellant claiming ineffective assistance of counsel at trial must identify the allegedly erroneous acts and omissions of counsel. *Strickland,* 466 U.S. at 690. The appellate court then determines whether, in light of all the circumstances, these identified acts or omissions were outside the wide range of competent assistance. *Id.*

**B. Analysis**

We initially note that, based on our resolution of Cooper's first two issues, Winegardner did not allow Cooper to plead guilty while he was incompetent.

Furthermore, we have seen nothing in the record to indicate that Winegardner failed to examine Cooper's file prior to trial. To the contrary, it appears from the record that Winegardner was aware of Cooper's mental health issues–real or feigned–starting with the motion to withdraw as counsel that he filed five days after he was appointed to represent Cooper, in which he stated that he could not effectively communicate with Cooper so as to be able to adequately represent him and that Cooper refused to cooperate with him. And at the beginning of the defense's voir dire, Winegardner introduced the philosophy of punishment and asked, "How does, oh, mental illness play into the philosophy of punishment? Do you punish a mentally ill person the same way as anybody else or differently?" He led the venire panel through a discussion of their friends' and relatives' mental health treatments and behaviors when untreated. And he discussed remorse as a reason to plead guilty with the potential jurors. One of the venire panel asked, "[I]n . . . light of what you're

saying that he's not all there, does the State have the . . . resources to put him in . . . in one of the hospitals?"

> Therefore, on this record, we cannot say that Winegardner advised Cooper to plead guilty while incompetent or that he failed to examine Cooper's file prior to trial. *See Strickland,* 466 U.S. at 690.  We overrule Cooper's third issue.

(SHR at 123-37) (bracketed words and phrases in original)

In turn, the Texas Court of Criminal Appeals refused petitioner's petition for discretionary review.

On state habeas review, petitioner's ineffective-assistance claims were addressed a second time following a hearing by affidavit.[3]  Petitioner also presented a report by Dr. Milton S. Rhea, a psychologist with the Dallas VA Medical Center, who examined petitioner in March or April of 2007, within three months of the offense.  (SHR at 32-37; Pet'r Reply, App. "A")

Counsel Winegardner responded to petitioner's allegations as follows:

> I was aware of Mr. Cooper's mental health issues as contained in the reports created by the various mental health professionals related to his case.  I made the decision to discuss with the jury and inform the panel of Mr. Cooper's mental health issues obliquely through voir dire rather than by offering psychological evidence.  I did this because of my concern that offering psychological evidence would have "opened the door" to the admission of the psychological record which suggested that, while Mr. Cooper suffered from mental illness, he also attempted to use his mental illness as a tool to avoid punishment.  The record in the court of appeals relates the language of the professionals which I judged the Defendant would be harmed by:

> Dr. Norman's October 3, 2007 competency evaluation indicated that Cooper was not competent to stand trial, that Cooper suffered from bipolar disorder with psychosis and alcohol abuse, and that Cooper manifested evidence of a thought disorder, delusional thinking, and hallucinations.  At one point, Dr. Norman noted, **"I would like to point out that I believe that some of this gentleman's reported symptomology is manipulative,** but without a doubt, he does suffer with an illness of psychotic proportion.

---

[3]Counsel Walker was not ordered to respond to the allegations.

Dr. Johnson's evaluation, conducted mid-January 2008, indicated that Cooper had regained competency to stand trial.  She reported that while confined to the mental hospital, Cooper received psychiatric treatment in the form of psychotropic medications, psychosocial rehabilitation, and formal competency training. **She also reported that Cooper appeared to be feigning or exaggerating some of his symptoms, providing specific examples:**

• **While Cooper consistently reported experiencing auditory and visual hallucinations, his accounts varied, and neither his treatment team nor unit staff ever observed him outwardly responding to internal stimuli. Cooper's behavior throughout his stay on the competency unit was continuously exemplary and paradoxical with his behavior while meeting with his treatment team, as well as inconsistent with his reported symptoms of psychosis.**

• Cooper told one of the nurses that he purposely performed poorly on a written competency test, stating, **"I could have done better, but I'm not sure if it's a good idea."  He told the nurse that he had heard from other patients that there was a way to stay at the hospital rather than doing jail time.**

• There was no evidence of current memory, intellectual, or psychological impairment that would prevent Cooper from being able to assist in his defense if he chose to do so.

• Cooper demonstrated that he understood the four plea options:  Guilty, not guilty, not guilty by reason of insanity, and no contest.  He also demonstrated that he understood the concept of a plea bargain and that he would be the one to decide whether to accept one, as well as the rights that would be forfeited if he accepted a plea bargain.

• Dr. Johnson concluded that Cooper was a "less than perfect defendant," and would be difficult to work with because of his **"attempts to avoid prosecution and be psychiatrically hospitalized."**

Dr. Johnson recommended that Cooper's defense attorney "should encourage him to be as forthcoming as possible with an emphasis on how this approach is beneficial to him and **the possible negative consequences of exaggerating or feigning impairment." She also added that Cooper "is not expected to regress in psychological functioning, but it is possible that he will continue his attempts to feign or exaggerate psychological deficits."**

These statements would have been admissible by the State had I introduced psychological evidence by document or testimony.  I judge that these statements

16

would have been extremely prejudicial to the result of Mr. Cooper's punishment hearing.

(Supp. SHR at 7-8) (emphasis in original)

Based largely on counsel's affidavit, in addition to the state court record and his personal recollections of the trial court proceedings, the state habeas judge entered the following relevant findings of fact:

. . .

D.  On September, 2007, this Court appointed Wm. Barry Norman, Ph.D. to do an examination of Applicant' regarding his competency to stand trial. The examination of Applicant was done by Dr. Norman, and his report, dated October 5, 2007, was received by this Court, . . . .

E.  Based upon the finding of Dr. Norman that Applicant was incompetent to stand trial, an agreed Judgment-Defendant Incompetent was signed by this Court on October 30, 2007, . . . . Thereafter, this Court received the report of the Texas Department of State Health Services, dated January 2, 2008, setting forth their findings that the Applicant was competent to stand trial, . . . .

F.  Applicant's contention that his trial counsel rendered ineffective assistance because he failed to present evidence of his mental health history as mitigation during the punishment hearing is without merit. In his affidavit, Mr. Winegardner states as follows:

> I was aware of Mr. Cooper's mental health issues as contained in the reports created by the various mental health professionals related to his case. I made the decision to discuss with the jury and inform the panel of Mr. Cooper's mental health issues obliquely through voir dire rather than by offering psychological evidence. I did this because of my concern that offering psychological evidence would have "opened the door" to the admission of the psychological record which suggested that, while Mr. Cooper suffered from mental illness, he also attempted to use his mental illness as a tool to avoid punishment. The record in the court of appeals relates the language of the

17

professionals which I judged the Defendant would be
harmed by.

Mr. Winegardner goes on to quote other statements by mental health
officials who evaluated Applicant as supporting his opinion that
Applicant used his "mental illness as a tool to avoid punishment."
Based thereon, Mr. Winegardner states his opinion that,

These statements would have been admissible by the
State had I introduced psychological evidence by
document or testimony. I judge that these statements
would have been extremely prejudicial to the result of
Mr. Cooper's punishment hearing.

G.   The Court is familiar with the reputation and legal abilities of trial counsel,
James Winegardner. He provided a thorough and aggressive defense for
Applicant at his trial.

(Supp. SHR at 10)

Based on its findings, and applying relevant Supreme Court precedent, the state habeas court

entered the following legal conclusions:

C.   Counsel's competence is presumed and a defendant must rebut this
presumption by proving that his attorney's representation was unreasonable
under prevailing professional norms and that the challenged action *was not
sound strategy.*

D.   In light of the totality of Mr. Winegardner's representation of Applicant, his
decision not to introduce psychological evidence by document or testimony
at the punishment hearing was not outside the prevailing norm of sound trial
strategy.

E.   Applicant has failed to prove that trial counsel provided ineffective assistance
of counsel.

(*Id.* at 11) (emphasis in original) (citations omitted)

Petitioner has failed to rebut the state courts' findings of fact by clear and convincing

evidence or to show the state courts' adjudication of his claims resulted in a decision that was

18

contrary to, or involved an unreasonable application of, clearly established federal law, or resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court. 28 U.S.C. § 2254(d). The test for deciding competence to enter a guilty plea is whether the defendant (1) has sufficient ability at the time of trial to consult with his attorney with a reasonable degree of rational understanding, and (2) has a rational as well as factual understanding of the proceedings against him. *Godinez v. Moran*, 509 U.S. 389, 396-400 (1993); *Drope v. Missouri*, 420 U.S. 162, 171-72 (1975); *Pate v. Robinson*, 383 U.S. 375, 378 (1966); *Dusky v. United States*, 362 U.S. 402, 402 (1960). Because a state court's competency finding is presumed correct, a petitioner bears a heavy burden in contesting his competency during federal collateral review. *DeVille v. Whitley*, 21 F.3d 654, 656 (5th Cir. 1994).

Petitioner asserts the state courts' determination of his claims is refuted by Dr. Rhea's report, discovered after his appeal, wherein Dr. Rhea opines–

> It is this examiner's opinion that this individual's current diagnosis of schizophrenia and bipolar disorder by Dr. Singa, and here a diagnosis of bipolar disorder is the same condition for which this individual was treated in the military service. This individual minimizes his condition and is much worse than he wants to discuss. His MMPI is indicative of a severe bipolar psychosis.
>
> This individual is extremely fragile, intolerant of stress and is overall unemployable and has been so for many years.

(Pet'r Reply at 2-41; Attach. to Pet'r Reply at p. 5)

Petitioner argues that Dr. Rhea's report forms the basis of his state and federal habeas petitions and argues that, had counsel investigated his mental health history and provided the report to Dr. Norman and the state hospital, the "report could have made a difference of such medical professionals making the determination that [he] could be restored to competency" and "could have

been clearly used to challenge the State hospital's findings recommending that [he] was restored to competency." (Attach Pet., "Additional Page to Ground Number One (B) & (C))  Petitioner further argues that the report "could have also provided a basis for [counsel] to move for an insanity defense, instead of advising [him] to enter an open plea of guilty." (*Id.* (C))  Dr. Rhea's report, however, apparently prepared in March 2007 and updated in April 2007, neither establishes that petitioner suffered from a "severe mental disease or defect" and "did not know that his conduct was wrong" at the time of the offense nor bears upon or disproves petitioner's competence to stand trial in April 2008. *See* TEX. PENAL CODE ANN. § 8.01 (West 2011).

There is nothing in the record to suggest that the court or counsel should have been aware that petitioner lacked the ability at the time he entered his pleas to discuss the case with counsel and to understand the proceedings against him. Instead, a review of the record reflects petitioner, having been found competent by a mental health expert in January 2008, was capable of understanding the charges against him and of consulting with his attorney at the time of the plea proceedings. Further, petitioner was admonished at length by the trial court regarding the nature and consequences of a guilty plea and indicated he understood the admonishments. Petitioner represented, on the record in open court, that he was pleading guilty because he was guilty and for no other reason, that he was not forced or coerced to plead guilty, that he understood the range of punishment, and that he "talked to his lawyers about all this." (RR, vol. 2, at 3-11)  Accordingly, the state court made no "unreasonable interpretation of the facts in light of the evidence presented in concluding that petitioner was competent to enter his guilty pleas. Clearly, petitioner suffers from mental illness, however the mere presence of a mental defect does not demonstrate mental incompetence to stand trial. *Bruce v. Estelle*, 536 F.2d 1051, 1059 (5th Cir. 1976).  There is no evidence from an expert

stating that petitioner was incompetent to stand trial or that he was so mentally incompetent as to be unable to understand the proceedings against him or consult his attorney. Petitioner failed to show in state court that he was mentally incompetent at the time of his trial, and he provides no new evidence of incompetency that would entitle him to federal habeas relief.

Nor is petitioner entitled to relief on his ineffective assistance claims. A criminal defendant has a constitutional right to the effective assistance of counsel at trial. U.S. CONST. amend. VI. To prevail on an ineffective assistance claim in the context of a guilty plea, a defendant must demonstrate that his plea was rendered involuntary by showing that (1) counsel's representation fell below an objective standard of reasonableness, and (2) there is a reasonable probability that, but for counsel's deficient performance, he would not have pleaded guilty and would have insisted on going to trial. *Hill v. Lockhart*, 474 U.S. 52, 56-59 (1985); *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *Smith v. Estelle*, 711 F.2d 677, 682 (5th Cir. 1983). In evaluating an ineffective assistance claim, a court must indulge a strong presumption that counsel's conduct fell within the wide range of reasonable professional assistance or sound trial strategy. *Strickland*, 466 U.S. at 668, 688-89. Judicial scrutiny of counsel's performance must be highly deferential and every effort must be made to eliminate the distorting effects of hindsight. *Id.* at 689. Strategic choices made by counsel after thorough investigation of the law and facts relevant to plausible options are virtually unchallengeable. *Id.* at 690.

Once a voluntary, knowing and intelligent guilty plea has been entered by a criminal defendant, all nonjurisdictional defects in the proceedings preceding the plea are waived, including all claims of ineffective assistance of counsel that do not attack the voluntariness of the guilty plea. *Smith*, 711 F.2d at 682; *Bradbury v. Wainwright*, 658 F.2d 1083, 1087 (5th Cir. 1981). Therefore,

deferring to the state courts' determination that petitioner's plea was voluntary, to the extent petitioner complains trial counsel failed to adequately investigate his mental health history, which is refuted by counsel's affidavit, the claim is nonjurisdictional and is waived by the plea, as is any such claim against his former counsel Pamela Walker. *United States v. Broce*, 488 U.S. 563, 573-74 (1989).

Regarding petitioner's claim that counsel should have presented evidence of his mental illness in mitigation of punishment, counsel testified regarding his reasons for not doing so, and the state courts determined counsel's strategy was not outside the professional norm. The state courts' determination is not an unreasonable application of *Strickland,* especially in light of the fact that evidence was elicited through the victim's testimony regarding petitioner's mental health issues. For example, the victim testified that petitioner suffers from schizophrenia and bipolar disorder, was prescribed medication for his "mental problems," had gone to Vernon State Mental Hospital after his arrest, was "crazy," and should be in a mental institution. (RR, vol. 3, at 63, 92-93, 97-98) Under these circumstances, it cannot be said that counsel's strategic decision not to present mental health evidence in an attempt to avoid unfavorable evidence that petitioner feigned or exaggerated psychological deficits to avoid prosecution was unreasonable.

### Evidentiary Hearing

Petitioner requests an evidentiary hearing for purposes of further developing the record in support of his claims. 28 U.S.C. § 2254(e)(2). However, the Supreme Court case *Cullen v. Pinholster* made clear that federal habeas review under the deferential 28 U.S.C. § 2254(d)(1) standard applicable to claims adjudicated on the merits in state-court proceedings is limited to the record before the state court. *Cullen* , — U.S. —, 131 S. Ct. 1388 (2011).

## II. RECOMMENDATION

Based on the foregoing, it is recommended that the petitioner's petition for writ of habeas corpus be denied.

## III. NOTICE OF RIGHT TO OBJECT TO PROPOSED FINDINGS, CONCLUSIONS AND RECOMMENDATION AND CONSEQUENCES OF FAILURE TO OBJECT

A copy of this report and recommendation shall be served on all parties in the manner provided by law. Any party who objects to any part of this report and recommendation must file specific written objections within 10 days after being served with a copy. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b). The court is extending the deadline within which to file specific written objections to the United States Magistrate Judge's proposed findings, conclusions, and recommendation until October __3__, 2013. In order to be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the magistrate judge's report and recommendation where the disputed determination is found. An objection that merely incorporates by reference or refers to the briefing before the magistrate judge is not specific. Failure to file specific written objections will bar the aggrieved party from appealing the factual findings and legal conclusions of the magistrate judge that are accepted or adopted by the district court, except upon grounds of plain error. *See Douglass v. United Services Automobile Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996).

## IV. ORDER

Under 28 U.S.C. § 636, it is ordered that each party is granted until October __3__, 2013, to serve and file written objections to the United States Magistrate Judge's proposed findings, conclusions, and recommendation. It is further ordered that if objections are filed and the opposing

23

party chooses to file a response, a response shall be filed within seven (7) days of the filing date of the objections.

It is further ordered that the above-styled and numbered action, previously referred to the United States Magistrate Judge for findings, conclusions, and recommendation, be and hereby is returned to the docket of the United States District Judge.

SIGNED September ____//____, 2013.

JEFFREY L. CURETON
UNITED STATES MAGISTRATE JUDGE